**IN THE COURT OF APPEALS OF IOWA**

No. 15-0377
Filed May 6, 2015

**IN THE INTEREST OF D.P.,**
**Minor Child,**

**T.G., Mother,**
        Appellant.

_____

Appeal from the Iowa District Court for Jasper County, Steven J. Holwerda, District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Larry Pettigrew of Pettigrew Law Firm, P.C., Newton, for appellant mother.

Thomas J. Miller, Attorney General, Kathryn K. Lang, Assistant Attorney General, Michael K. Jacobsen, County Attorney, and Jonathan Noble, Assistant County Attorney, for appellee State.

Darrin Hamilton, Newton, attorney and guardian ad litem for minor child.

Considered by Vogel, P.J., and Potterfield and Mullins, JJ.

**POTTERFIELD, J.**

A mother appeals the termination of her parental rights.[1]

We review termination of parental rights proceedings de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). "'We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses.'" *Id.* (citation omitted).

The child, D.P. (born in October 2003), came to the attention of the Iowa Department of Human Services (DHS) on October 23, 2013,[2] after DHS received allegations that the child's mother was using and selling methamphetamine. During an unannounced visit to the mother's home on October 27, 2013, a child protective worker and police officer smelled marijuana coming from the residence. A Drug Task Force officer was called to assist and also smelled marijuana. A search warrant was obtained and executed. During the search, officers found a marijuana roach, marijuana residue, methamphetamine, a blow torch, and scales that tested positive for methamphetamine. All items were located in the home and accessible to the child. An emergency removal order was obtained, but the child's whereabouts were not immediately known. The child was located and placed outside the home.

On November 8, 2013, D.P. was adjudicated a child in need of assistance (CINA) pursuant to Iowa Code section 232.2(6)(b), (c)(2), and (6)(n) (2013). The

---

[1] The father's parental rights were also terminated. He did not appeal.
[2] DHS had earlier involvement with the mother and child in May 2006 after D.P. was left in the care of an uncle with mental health issues, and D.P. was found outside and naked.

mother was not in attendance. DHS was granted temporary legal custody of the child and the child remained outside the parents' care.

The mother appeared at the December 6, 2013 dispositional hearing. A dispositional order dated that same day continued the child's placement outside the mother's care. The mother entered into a stipulation agreeing to submit to random drug screens; participate in Family Safety, Risk, and Permanency (FSRP) services; participate in substance abuse and mental health evaluations; and follow all recommendations. The mother was unemployed and homeless. Supervised visits between mother and child began in March 2014.

A review hearing was held on June 6, 2014. The mother had not made significant progress toward reunification. She did not have housing or employment. She had obtained a substance abuse evaluation, which did not recommend services. DHS asked that the mother attend two more weekly supervised visits "to establish a consistent pattern" of visiting with the child and "complete at least one drug test" before semi-supervised visits would be instituted.

The mother's visits were not consistent. She did not have permanent housing and, in July and August, she was living with a person with a history of illegal substance use. The mother was aware the person she was living with was not approved to be around D.P. At an August 29, 2014 family team meeting, the mother was informed she needed to find housing, be with "appropriate friends," and remain sober.

On September 8, 2014, the mother contacted her FSRP worker and indicated she had been fighting over the weekend with the man with whom she

was living. The mother reported she was going to see Jennifer Allensworth at Integrated Treatment Services. On September 17, 2014, the mother informed the FSRP worker that her paramour was entering inpatient substance abuse treatment the next day. The September 2014 FSRP report indicated the mother had completed a mental health evaluation and had begun her substance abuse treatment. The report noted, "[The mother] has limited positive supports, she needs to ensure that she is associating with positive persons and not engaging in relationships with others that are using illegal substances."

The mother attended only part of one visit in October (October 29) and one visit in November (November 26). The mother reported getting a job in November. She did not have housing or transportation. The October and November FSRP reports indicate the child was aware he had been out of the home for one year and asked questions about adoption by the foster family or a respite care family he stayed with on occasion.

On November 13, 2014, the State filed an application for a permanency hearing, noting the child had been placed outside the parents' care for more than twelve months. A permanency hearing "(and termination, if filed)" was scheduled for December 5.

The January 4, 2015 FSRP report includes this notation:

> The court hearing was continued for February as a permanency hearing. [The mother's] lawyer and this worker had conversations that [the mother] needs to schedule and have regular visits. [She] also needs to stop being with inappropriate friends. [She] needs to gain appropriate housing. [The mother] understands this. . . . Both [the mother and father] know that DHS has recommended termination of parental rights at the permanency hearing. They both stated they will complete what needs to be done ASAP in order to prove that they want to remain with [D.P.]

On January 12, 2015, DHS social worker Monica Loupee was informed by Allensworth of Integrated Treatment Services that the mother's case had been closed as of December 24, 2014, because the mother "was no call no show to the last few appointments" and the counselor had not heard from her.

A petition to terminate parental rights was filed on January 14, 2015. A permanency/termination hearing was held on February 6. Exhibits introduced showed that in the prior eleven months, the mother had attended twenty-two visits, and missed or was more than fifteen minutes late for twenty-three. The guardian ad litem stated the child had initially hoped he could return to his mother's home, but now believed "it was time to be adopted and have a forever home." Social worker Loupee testified D.P. "himself told me of his permanency date and that was in October of last year." Loupee testified D.P. loves his parents but "feels like he's been safe since he's been in foster care." She stated, "[I]t's time for [D.P.] to have permanency and the parents have not done the things that we've asked them to do to provide a safe, stable home for [D.P.], and I want that for him."

The mother requested an additional six months to achieve reunification. She testified she was working and saving money to obtain housing, which she felt she would have by March 1. She stated she "finally got rid of" the inappropriate people in her life. She testified that when the court ordered the rescheduled permanency hearing and indicated a termination petition might be filed, "I started working."

The juvenile court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(e), (f), and (i). The court found:

9. The mother has not fully invested herself in this case either. Following the removal, the mother has only exercised approximately one-half of her visits with the child. Of the 55 scheduled visits, the mother has fully exercised 22 visits, and has either cancelled or been more than 15 minutes late for 23 visits. The visits started out as weekly and supervised, and never progressed beyond that. Mother asked for an extended visit one time and then cancelled the visit. Mother blames her visitation problems on her lack of transportation, but this is more of a reflection of her lifestyle and her choices. When this case started in October 2013, mother was unemployed, admittedly using drugs, and living from place to place. For the most part, this nomadic lifestyle has not changed throughout the case. She reports part-time employment for the last three months and the hopes of being able to save enough money to have her own place by March. Although throughout the case, she has not had stable housing and continued to live from place to place, and couch to couch, including two stops with known drug users. She has had neither a telephone nor an address which made it impossible for the Department to stay in contact with her. The mother says all the "right" things but her "follow through is generally lacking." She reports being "clean" and following all recommended substance abuse treatment but was discharged "unsuccessfully" from Integrated Treatment Services, her treatment provider.

10. On a positive note, mother is employed part-time for the first time in the history of the case, she provided verification of clean UAs, and she apparently loves her child and is bonded with him.

11. Monica Loupee, the DHS case manager, recommended termination as the parents have not completed their goals and they are not close to completing them. She also testified that if termination occurs, there are three possible adoptive homes: the current foster family, a respite foster family, and one of [D.P.'s] teachers.

12. [D.P.] told Ms. Loupee and his Guardian Ad Litem that "it's time" and he wants a "forever home."

The court determined termination was in the child's best interests.

On appeal, the mother does not challenge that statutory grounds exist. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010) (stating that when a parent does not dispute the existence of statutory grounds we need not discuss whether

those grounds exist). She argues, however, that the court erred in finding termination was in the child's best interests.

We adopt the juvenile court's reasoning as our own:

> In determining whether termination of parental rights is in the best interest of the child, the court must apply the criteria set out in Section 232.116(2). The parents' ability to care for their child is obviously affected by the father's substance-related problems and general lack of interest, and the mother's unstable and nomadic lifestyle. They have not been able to care for the child for over a year and will not be able to do so in the near future. The mother's substance-related problems early in the case, her lack of employment/income, lack of stable housing, and general lack of interest or failure to make the child a priority, have prevented her from providing for the child's safety, long-term nurturing and growth, and physical, mental and emotional needs for the past 16 months, and will continue to prevent her from doing so for the foreseeable future. . . .
>
> The parents ask for an additional six months, alleging they can be successful "this time" if given additional time. The parents have been given 16 months to prove themselves and have not done so. After the first 12 months, the parents were warned of the prospects of termination, yet neither one has shown any increased urgency to prove themselves. In fact, . . . the mother continues to offer promises of what she will do in the future. The Court does not believe that an additional six months will improve the situation or make it any more likely that the child could be successfully returned to either parent.
>
> In contrast, the child has done well in foster care. He entered foster care at 10 years old, being "wild," subject to "meltdowns," and having been exposed to more experiences than any 10 year old should be. He had smoked cigarettes and marijuana, and was able to manufacture a pop can into a "pot pipe." Through the stability of the foster home and counseling, his behaviors have improved, his school grades have improved, and he is involved in healthy activities in school and in church. On October 28, 2014, [D.P.] informed his foster mother, without prompting, that this was the one-year anniversary of his removal. He has also stated that "it's time" and that he wants a "forever home." The Court agrees. It is in the best interest of [D.P.] for termination and adoption to occur so that he can have a "forever home," rather than remain in limbo until his parents can correct their problems or make him a priority, if ever.

Terminating the mother's parental rights so the child can be permanently placed gives primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional needs of the child under section 232.116(2). This child has waited long enough in hopes his mother will someday provide a safe and stable home. *See In re Dameron*, 306 N.W.2d 743, 747 (Iowa 1981) (noting we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child).

And while we have no doubt the mother loves her child, we do not find that the parent-child bond is such that termination would be detrimental to the child. *See* Iowa Code § 232.116(3)(c). We affirm the termination of the mother's parental rights.

**AFFIRMED.**